**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ROSA CASTRO,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:09-CV-1700** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| *Commissioner of the Social* | § | |
| *Security Administration*, | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

This is a consent case before United States Magistrate Judge Paul D. Stickney. Rosa Castro ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. The Court has considered Plaintiff's Brief, filed December 11, 2009, and Defendant's Brief, filed January 7, 2010. Having reviewed the evidence of the parties in connection with the pleadings, the Court hereby orders that the Commissioner's decision be **AFFIRMED**.

## I. BACKGROUND[1]

### A. Procedural History

Plaintiff filed applications for DIB and SSI on September 7, 2007, alleging disability since May 1, 2007. (Tr. 101-10.) Both claims were denied initially (January 16, 2008) and on reconsideration (March 20, 2008). (Tr. 44, 57.) Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 63.)

---

[1] The following history comes from the transcript of the administrative proceedings, which is designated as "Tr."

ALJ William H. Helsper presided over Plaintiff's hearing on November 20, 2008 in Fort Worth, TX. (Tr. 23-39.) Plaintiff appeared at the hearing with counsel and testified. (*Id.*) Shelly K. Eike appeared and testified as a vocational expert ("VE"). (*Id.*)

The ALJ issued his decision finding Plaintiff "not disabled" on February 4, 2009. (Tr. 7-22.) Plaintiff filed a timely request for review by the Appeals Council. (Tr. 4-5.) The Appeals Council denied Plaintiff's request for review on July 14, 2009. (Tr. 1-3.) Plaintiff filed the instant action in the Northern District of Texas on September 11, 2009, seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. § 405(g). (Doc. 1.)

### B. Factual History

#### 1. Plaintiff's Age, Education, and Work Experience

Plaintiff's date of birth is July 17, 1964. (Tr. 118.) Her primary language is Spanish. (Tr. 26-27, 122.) Plaintiff can speak some English, but she is not literate. (*Id.*) She attended school in Mexico, but it is unclear whether she stopped after high school or 6th grade. (*Compare* Tr. 270 *with* Tr. 353.) Plaintiff was previously employed as a molding machine operator. (Tr. 122.)

#### 2. Plaintiff's Medical Evidence

*Physical Limitations*

Plaintiff suffered a work-related injury to her left arm on September 12, 2006. (Tr. 317.) X-rays taken on Plaintiff's left hand at that time did not reveal any fracture or dislocation. (*Id.*) She was diagnosed with a left hand contusion/crush injury. (*Id.*) At that time, Plaintiff's doctors concentrated their efforts on Plaintiff's bruised and bleeding left hand injury. (Tr. 311.) However, as the pain in Plaintiff's hand decreased over the following weeks, she began to complain of persistent pain in her left elbow and shoulder. (*Id.*) On November 9, 2006, Plaintiff noted that while she still had significant pain in her hand, the pain radiated proximally into the

anterior left forearm and all the way up to the left shoulder. (Tr. 303-04.) Plaintiff reported on December 7 that her primary complaints were now related to her left elbow and shoulder with limited overhead capacity and that these complaints had gone largely unaddressed by her doctors. (Tr. 332-33.) On December 20, Plaintiff could not touch the back of her head with both hands. (Tr. 344.) An electromyography ("EMG") conducted by Ranil Ninala, M.D. on December 28 showed no evidence of left medial, ulnar, or radial neuropathy. (Tr. 323.) Plaintiff's left hand finally began to show improvement, unlike her elbow or shoulder. (*Id.*)

Plaintiff met again with Dr. Ninala on February 8, 2007. (Tr. 305.) Dr. Ninala noted Plaintiff's continued inability to lift her left arm above shoulder level due to pain in the shoulder and elbow. (*Id.*) At that time, Plaintiff's insurance adjuster was unwilling to agree that Plaintiff's left shoulder problems were compensable because the elbow and shoulder had not been discussed at length in previous medical notes. (*Id.*) Dr. Ninala suggested that Plaintiff file a separate workers' compensation claim, specifically addressing Plaintiff's left shoulder problems, so that she might receive treatment. (*Id.*) Plaintiff was diagnosed with a left shoulder rotator cuff strain/sprain/tendonitis and left medial epicondylitis. (Tr. 306.)

On February 28, 2007, Plaintiff informed John Hood, D.O. that she has been unable to work full time since her injury because of the various limitations doctors have placed on her. (Tr. 332.) Plaintiff stated that she had averaged 8-16 hours per week or less doing the same work as before. (Tr. 123, 332.) Dr. Hood expressed his belief that Plaintiff's left shoulder injury needed further treatment and placed her off work. (Tr. 336.) One month later, Plaintiff presented to Norman McCall, M.D. who had treated her hand shortly after her initial injury. (Tr. 311, 317.) Plaintiff explained that her left hand pain was her primary concern immediately following the accident. (Tr. 311.) However, her left shoulder was also involved, as it was "twisted and pulled

while she held the air gun in one hand with the left arm elevated and being pinched between pieces of the machine." (*Id*.) Plaintiff stated that her left shoulder pain "persists and has progressed preventing her from using the left hand or arm." (*Id*.) Dr. McCall diagnosed Plaintiff with a left shoulder strain and derangement. (Tr. 312.) He also ordered a magnetic resonance imaging ("MRI") of Plaintiff's left shoulder, which showed that Plaintiff's rotator cuff was intact with no evidence of tear or tendonitis. (Tr. 347.) The MRI, taken April 9, 2007, also exhibited small joint effusion, slight overgrowth of the acromioclavicular joint, and fluid surrounding the bicipital tendon, which could be due to bicipital tenosynovitis. (*Id*.) Plaintiff stopped working on May 1 because she "could no longer perform [her] job and was let go." (Tr. 123.)

Plaintiff presented to Richard A. Lane, D.O. on May 9, 2007, complaining of throbbing pain in the left shoulder, wrist, and elbow. (Tr. 204.) X-rays taken that day showed that Plaintiff's left shoulder and elbow were structurally intact. (Tr. 253.) However, the ulnar carpal joint space in Plaintiff's left wrist appeared to be increased. (*Id*.) Dr. Lane diagnosed Plaintiff with a left shoulder internal derangement, left elbow strain, left wrist strain, and cervical injury. (Tr. 205.) On Dr. Lane's orders, Plaintiff began physical therapy, which she attended regularly for about six months despite continuing complaints of shooting pains ranging from her left wrist up through her elbow to her shoulder and trouble sleeping. (Tr. 205, 209-26, 233-52.) Plaintiff continued to meet with Dr. Lane on a monthly basis during that time. (Tr. 180, 182, 186, 192, 197, 199, 202, 205.) On August 8, Plaintiff reported to Dr. Lane that workers' compensation was denying her requests for physical therapy and treatment for all parts of her arm except her left wrist. (Tr. 198.) Plaintiff opined that she did not want to continue physical therapy, or receive an injection in the left wrist, until the left shoulder and elbow were made part of her compensable injury and she had received an MRI on these areas. (Tr. 181.) The left shoulder and left elbow

were added to Plaintiff's compensable workers' compensation injury after a court hearing on October 3. (*Id.*) On October 25, Plaintiff underwent an EMG on both arms that showed bilateral "demyelinating median motor sensory neuropathy of the wrists, suggesting carpal tunnel syndrome" (worse on left). (Tr. 228.) The EMG also displayed "compression neuropathy of both ulnar sensory nerves at wrist and left radial motor compression neuropathy." (*Id.*)

On March 25, 2008, Dr. Lane completed a form titled "Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment." (Tr. 171-77.) Dr. Lane indicated that Plaintiff was not capable of performing sustained sedentary or light work on a regular and continuing basis, i.e. 8 hours a day, 5 days a week, or equivalent, even if she could alternate standing and sitting. (Tr. 171.) Dr. Lane noted that Plaintiff could sit, stand, or walk for about one hour at a time before requiring a rest, and only two hours total over the course of a work day. (Tr. 173.) He also opined that Plaintiff should not lift or carry any weight at all for periods of time that might collectively exceed an hour over the course of a typical work day. (Tr. 173-74.) Finally, Dr. Lane specified that Plaintiff cannot use her hands/arms to reach, handle, finger, or feel objects in the course of a typical work day, although she does have limited (2 hours per day) ability to stoop, kneel, or crouch. (Tr. 175-76.) Dr. Lane indicated that these limitations have existed since September 12, 2006. (Tr. 177.)

Robin Rosenstock, M.D., completed a physical residual functional capacity ("RFC") assessment of Plaintiff on January 14, 2008. (Tr. 288-95.) In contrast to Plaintiff's treating physician's report two months later, Dr. Rosenstock found that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and could likewise push or pull objects, subject to these restrictions. (Tr. 289.) Also, Plaintiff was found to be able to sit, stand, or walk for about six hours in an eight-hour workday. (*Id.*) Dr. Rosenstock opined that

Plaintiff had no postural limitations besides an occasional ability to crawl and no ability to climb a ladder, rope, or scaffolds. (Tr. 290.) Finally, Dr. Rosenstock indicated that while Plaintiff could use her hands/arms to handle, finger, and feel objects, she was limited in overhead reaching because of tenderness along the bicipital groove of her left shoulder. (Tr. 291.)

On May 29, 2008, Plaintiff presented to Dr. Hood for evaluation. (Tr. 322.) Dr. Hood noted that Plaintiff's left shoulder and elbow underwent an MRI on December 7, 2007. (Tr. 323.) Unlike the MRI ordered by Dr. McCall on April 9, 2007, the December MRI showed "moderate to high grade articular side and intrasubstance partial tear involving the anterior fibers of the supraspinatus tendon." (*Id.*) According to Dr. Hood's report, Plaintiff met with Hooman Cedijhi, M.D., on February 13, 2008. (*Id.*) Dr. Cedijhi evaluated the medical evidence and noted that Plaintiff's subjective complaints did not match the objective findings. (Tr. 324.) Dr. Cedijhi found that Plaintiff's shoulder, spinal, and elbow complaints could not have been medically related to Plaintiff's injury on September 12, 2006 and that, if true, they must have originated at a later date. (*Id.*) Dr. Hood's report also shows evidence that Plaintiff continued to meet with Dr. Lane throughout the early months of 2008. (*Id.*) Dr. Hood's summary of Dr. Lane's reports indicate that Plaintiff underwent a physical performance examination on March 28, 2008, where Plaintiff's wrist, elbow, and shoulder pains rendered her unable to complete any parts of the lift or grip tests. (*Id.*) In addition, Plaintiff had refused additional physical therapy until she had seen an orthopedic doctor, which was an ongoing obstacle due to Plaintiff's insurance and transportation issues. (Tr. 325.) However, Plaintiff did follow Dr. Lane's April 10 recommendation to have a left elbow injection. (*Id.*) Dr. Hood reported that as of May 29, Plaintiff was unable to straighten out her left arm and experienced intense pain when trying to elevate her left elbow. (*Id.*)

Dr. Hood met again with Plaintiff on November 12, 2008. (Tr. 360.) Since May, Plaintiff had seen orthopedic surgeons Joseph Daniels, M.D. and John Sazi, M.D, who agreed, at least in part, in their diagnoses. (*Id*.) Dr. Daniels diagnosed Plaintiff with (1) left wrist carpal tunnel, (2) left elbow lateral epicondylitis, and (3) left shoulder impingement. (*Id*.) Dr. Daniels stated that Plaintiff needed a left carpal tunnel release and a lateral epicondylar release of the elbow. (*Id*.) Dr. Sazi diagnosed Plaintiff with (1) bilateral carpal tunnel syndrome, (2) cubital tunnel syndrome in the left elbow, (3) radial tunnel syndrome in the left arm, and (4) left shoulder impingement. (*Id*.) Dr. Sazi agreed with Dr. Daniels that Plaintiff needed a left carpal tunnel release, but also thought she needed a left shoulder decompression. (*Id*.) Dr. Hood indicated that the treatment recommended by Drs. Daniels and Sazi could possibly alleviate or cure all of Plaintiff's symptoms. (Tr. 361.)

*Mental Limitations*

In her disability report, Plaintiff also cites depression as a factor limiting her ability to work. (Tr. 123, 156.) On August 8, 2007, Dr. Lane indicated in a follow-up report that he was scheduling Plaintiff for a psychological evaluation. (Tr. 198.) However, Dr. Lane stated that Plaintiff exhibited "no signs or symptoms of depression," and his report itself did not allude to any other possible reasons for sending Plaintiff for a psychological evaluation. (*Id*.) On August 20, Plaintiff was evaluated by Dr. Sat Kartar Khalsa, Ph.D. (Tr. 352.) Dr. Khalsa stated that "due to concern that her emotional/mental status might be having an impact on her ability to participate in treatment and having exhausted other appropriate options for medical treatment," Dr. Lane referred Plaintiff "for a psychological evaluation to determine if she would be appropriate for a trial of individual counseling as well as to determine any other treatment needs." (Tr. 352.)

When meeting with Dr. Khalsa, Plaintiff revealed that her sources of stress included financial problems and emotional distress due to her inability to be as physically and socially active as she was prior to being injured. (Tr. 353.) Plaintiff stated that her chief complaint was: "I want to get better and go back to work – I don't want to lose everything because of an accident." (Tr. 350.) Plaintiff denied any pre-injury personal or family history of psychiatric treatment, alcoholism, or suicide attempts. (Tr. 353.) Plaintiff reported that her current symptoms included episodes of helplessness, nervousness, frustration, and irritability. (*Id*.) Dr. Khalsa administered a number of psychological tests, which revealed that Plaintiff perceives a high need for additional medical treatment and diagnostic testing to address her difficulties with pain. (*Id*.) Also, Plaintiff's test results indicate that she suffers from high perceived levels of depression and anxiety as a result of her pain problem and physical limitations and that she strongly believes that pain automatically entails physical disability. (Tr. 353-54.) Plaintiff tested in the "mild" range of depressive symptoms and claimed feelings of discouragement, insomnia, and low motivation. Dr. Khalsa opined that Plaintiff's levels of subjective distress put her "at risk for a pattern of delayed recovery and even worsening disability." (Tr. 354.) Dr. Khalsa recommended that Plaintiff attend sessions of individual therapy so as "to increase appropriate skills for coping with situational stress, emotional distress, and persistent pain… maximizing her chances for return to a higher level of functioning and better quality of life, including return to work in a capacity of which she is capable." (Tr. 354-55.) However, Plaintiff's insurance denied Dr. Khalsa's request to provide for this treatment. (Tr. 356.)

On December 12, 2007, Plaintiff was assessed in an independent psychological evaluation by Roxanne Scott, Ph.D. (Tr. 269-73.) Dr. Scott noted that Plaintiff took only over-the-counter medications such as Nexium and Ibuprofen for pain, refusing prescription

medications because she was "afraid" of them. (Tr. 269.) Plaintiff complained that she was unable to perform many personal and household tasks due to her injuries and pain. (Tr. 270.) Also, Plaintiff reported that she was having difficulty comprehending instructions and completing tasks in a timely manner. (*Id*.) Plaintiff's inability to work resulted in stress over mounting bills, which Plaintiff compensated for by overeating. (*Id*.) Plaintiff stated that she had been depressed since she learned her "credit was ruined." (Tr. 271.) Dr. Scott stated that while an interpreter was provided so Plaintiff could communicate, Plaintiff could not pick up a pencil or personally complete her intake documents due to her injuries. (*Id*.) When asked, Plaintiff was able to perform basic tasks such as counting backwards from '20' and could spell and recall words and numbers forward and backward. (*Id*.) Plaintiff's abilities in abstract ability/logic and judgment/insight were adequate. (*Id*.) Dr. Scott noted that while Plaintiff had difficulty naming ten fruits and performed poorly on mathematic items, these are tasks that could reflect Plaintiff's lack of education and not a psychological disorder. (*Id*.) Plaintiff was diagnosed with a mood disorder due to her left arm injuries, with major depressive-like episode. (Tr. 272.) She was assigned a global assessment of functioning "GAF" score of 55.[2] (*Id*.) Dr. Scott indicated that if Plaintiff were unable to regain any physical mobility, she would likely require intensive educational training and occupational skills training. (*Id*.)

Based on Dr. Scott's report, Cate Miller, M.D. completed a mental RFC assessment and a Psychiatric Review Technique of Plaintiff on January 14, 2008. (Tr. 274-87, 296-98.) On the latter form, Dr. Miller evaluated Plaintiff's mental symptoms as an affective disorder, best characterized as "mood disorder, due to left shoulder, elbow, wrist damage." (Tr. 277.) Also, Dr.

---

[2] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* [34] (4th ed. Text rev. 2000) (DSM). A GAF score of 50-60 indicates moderate symptoms and/or a moderate impairment in social, occupational, or school functioning. *See id.*

Miller noted that Plaintiff was mildly limited in maintaining social functioning and moderately limited in activities of daily living and in maintaining concentration, persistence, or pace.[3] (Tr. 284.) Plaintiff had not suffered from any extended episodes of decompensation. (*Id*.) Dr. Miller indicated that the medical evidence established neither the "A & B" nor the "C" criteria required under Listing 12.04 of the Listing of Impairments. (Tr. 285-86.)

On the mental RFC assessment, Dr. Miller noted that while Plaintiff was not significantly limited in her abilities to remember, understand, and carry out short and simple instructions, she bore moderate limitations in her ability to perform such tasks with more detailed instructions that might require concentration for an extended period of time.[4] (Tr. 296.) Dr. Miller found that Plaintiff was moderately limited in her abilities to respond appropriately to changes in the work setting and to complete a normal workday or workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable amount of rest. (Tr. 297.) However, Dr. Miller found that Plaintiff was not significantly limited in regard to social interactions, punctuality, or decision-making. (Tr. 296-97.) Dr. Miller summarized her findings as follows: "[Plaintiff] can understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting." (Tr. 298.)

---

[3] The degrees of limitation for these categories are – from least severe to most severe – none, mild, moderate, marked, and extreme. (Tr. 284.)

[4] The degrees of limitation for these categories are: not significantly limited, moderately limited, markedly limited, no evidence of limitation in this category, and not ratable on available evidence. (Tr. 296-97.) Of twenty mental activities, Dr. Miller indicated that Plaintiff was "not significantly limited" in fifteen and "moderately limited" in five. (*Id*.)

<u>3. Plaintiff's Hearing</u>

Plaintiff was represented by counsel at her November 20, 2008 hearing. (Tr. 25.) After the ALJ admitted the exhibits into the record, the ALJ examined Plaintiff. (*Id.*) The questioning began as follows:

ALJ:            Do you speak English?

Plaintiff:      A little bit.

ALJ:            A little bit. Okay.

Plaintiff:      Maybe a little bit. Not much, though. I prefer somebody translates.

ALJ:            It sounds pretty good to me right now. I think we can go ahead without an interpreter.

(Tr. 25-26.) Next, the ALJ questioned Plaintiff about her family, her education, her injury, and her present condition. (Tr. 26-32.) The record contains several examples where Plaintiff's difficulty speaking English created ambiguity and confusion. (Pl. Br. 7-8.) Specifically:

ALJ:            Are you right or left-handed?

Plaintiff:      It's the - -

ALJ:            Your left?

Plaintiff:      It's - -

ALJ:            That one?

Plaintiff:      Yes, the left.

ALJ:            Was that the hand that was injured?

Plaintiff:      Yes, it was.

(Tr. 27.) A few minutes later, the ALJ questioned Plaintiff about the extent of her symptoms. (Tr. 30.) Plaintiff explained that because her left hand did not grip things well, she used her right hand to assist. (Tr. 31.)

| | |
|---|---|
| ALJ: | Okay. But as I understand, before the accident you were left-hand dominant? That was your - - |
| Plaintiff: | Before the accident? |
| ALJ: | Yes. |
| Plaintiff: | We don't have any problems, because my job, it's - - |
| ALJ: | I mean were you left-handed, or were you right-handed. |
| Plaintiff: | Oh, right, the right. |
| ALJ: | Oh, so you're right-handed. |
| Plaintiff: | Yeah, it's the right hand. |
| ALJ: | Oh, excuse me. Okay. |
| Plaintiff: | Yeah. I'm sorry. |
| ALJ: | All righty. |
| Plaintiff's Counsel: | *Escribir? No, si?* |
| Plaintiff: | *Si*, for my right. Yeah. Yeah. |

(Tr. 31.)

Such use of Spanish words and phrases proved necessary in other instances over the course of the hearing.

| | |
|---|---|
| ALJ: | How's your appetite? |
| Plaintiff: | I don't - - |
| ALJ: | Are you eating your meals okay? |

| | |
|---|---|
| Plaintiff: | The appetite, what's that? |
| ALJ: | *Apetito*. |
| Plaintiff: | *Apetito?* Last, last year I gained too much weight because - - |

(Tr. 29.)

After the ALJ finished his examination, Plaintiff's counsel examined Plaintiff. Plaintiff had worked thirteen years as a machine operator at the factory where she was injured. (Tr. 32.) Plaintiff stated that she relied on her daughter to cook and help her dress. (Tr. 32-33.) Plaintiff's right hand is unaffected by her ailment and she can use it to pick up a gallon of milk. (Tr. 33.) When Plaintiff's counsel asked her whether she could sit for a long period of time, Plaintiff did not understand. (Tr. 34.)

| | |
|---|---|
| Plaintiff: | Excuse me, I don't understand too much. |
| Plaintiff's Counsel: | Okay. *Cuanto horas… sentarse*, sit - - how many hours? |
| Plaintiff: | Oh, too many hours. |
| Plaintiff's Counsel: | Can you sit for eight hours? |
| Plaintiff: | No. Maybe like six a, six a day because - - |
| Plaintiff's Counsel: | Okay. |
| Plaintiff: | - - because we go outside, look at my dogs and things. |

(*Id*.) Then, Plaintiff revealed that though she had sought medical attention for her depression, she hadn't seen that doctor for six months. (Tr. 35.) Plaintiff stated that her husband works and that he has a health insurance policy that covers the entire family. (*Id*.) Plaintiff did not receive any special vocational training in her thirteen-year career as a machine operator. (Tr. 35-36.)

The second and final witness was the VE. (Tr. 36-39.) She testified that Plaintiff's past relevant work as a plastic molding machine operator is considered light, semi-skilled work, with

an SVP of 3. (Tr. 37.) The VE stated that an illiterate person, 44 years of age with the RFC that limits her (1) to performing non-complex tasks and (2) from using her non-dominant upper extremity would not be able to perform Plaintiff's past relevant work. (*Id*.) The VE testified that the low-level skills Plaintiff possessed in her past relevant work as a machine operator were rendered moot without the use of both upper extremities. (*Id*.) However, a person with the same RFC could function in various unskilled jobs available both nationally and in Texas, such as a conveyor tender (light, SVP of 1), sorter (light, SVP of 2), or small item inspector (light, SVP of 2.) (*Id*.) Finally, the VE testified that a person with the same RFC who also experienced pain with the use of the right arm could still find work as a sorter or small item inspector nationally and in Texas, even if the functional limitations in the right arm were at the sedentary level. (Tr. 38-39.)

### C. ALJ's Findings

First, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2012. (Tr. 15.) Second, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 1, 2004, the Plaintiff's alleged disability onset date. (*Id*.) Third, the ALJ found that Plaintiff has the severe impairments of left shoulder internal derangement and left elbow strain. (*Id*.) Fourth, the ALJ found that Plaintiff's impairments, considered individually or in combination, do not meet or medically equal one of the listed impairments in Appendix 1 of the Regulations. (Tr. 16.) Fifth, the ALJ found that Plaintiff has the RFC to (1) sit no more than two hours in an eight-hour workday, (2) stand and/or walk no more than six hours in an eight-hour workday, and (3) lift, carry, push, or pull ten pounds frequently and twenty pounds occasionally. (Tr. 19) Plaintiff is also precluded from the use of her non-dominant (left) upper extremity and from performing complex job duties. (*Id*.) Sixth, the ALJ found that

Plaintiff is incapable of performing past relevant work. (Tr. 20.) Seventh, the ALJ found that Plaintiff was 42 years old on her alleged date of disability onset and can communicate in English, though she is functionally illiterate. (Tr. 20-21.) Eighth, the ALJ found that Plaintiff has no transferable job skills. (Tr. 21.) Ninth, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are a significant number of jobs in the national economy that she could perform. (*Id*.) Finally, the ALJ found that Plaintiff was not disabled, as defined by the Act, since May 1, 2007. (Tr. 22.)

## II.  ANALYSIS

### A.  *Standard of Review*

A claimant must prove that she is disabled for purposes of the Act to be entitled to Social Security Benefits. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the Regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability.

*Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at Step 5 to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be shifted either by reference to the Medical-Vocational Guidelines of the Regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236, 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

Having reviewed the applicable legal standards, the Court turns to the merits of the case.

## B. Issues for Review

Plaintiff contends that the ALJ erred in (1) failing to inquire on the record whether there was a conflict between occupational evidence provided by the VE and information in the Dictionary of Occupational Titles ("DOT")[5] and then relying on that testimony at Step 5 in the disability determination; (2) failing to find that Plaintiff has an inability to communicate in English; and (3) forcing Plaintiff to testify at her hearing without an interpreter even though she expressed that she "prefer somebody translates." Additionally, Plaintiff argues that the case be remanded to a different ALJ. The Commissioner argues that (1) the ALJ's failure to inquire about possible conflicts with the DOT was harmless error and his reliance on the VE's testimony at Step 5 was supported by substantial evidence; (2) substantial evidence supports the ALJ's finding that though Plaintiff was illiterate, she could communicate in English; and (3) the ALJ provided Plaintiff with a full and fair hearing even though Plaintiff was not provided with an interpreter.

## C. Conflicts Between VE Testimony and DOT

When, as here, a decision is reached at Step 5, it means that the claimant established a *prima facie* case of disability, and the burden then shifted to the Commissioner to show that other work exists in the national economy that the claimant can perform despite his or her impairments. *Greenspan*, 38 F.3d at 236. In determining whether a claimant can perform alternative, available work, the Commissioner may consult VEs and/or the Dictionary of Occupational Titles (DOT). VEs assess whether jobs exist for a person with the claimant's precise abilities. *See e.g., Gilliam v. Califano*, 620 F.2d 691, 694 n.1 (8th Cir. 1980). They also assist in determining complex issues, such as whether a claimant's work skills can be used in

---

[5] Plaintiff also cites to the Selected Characteristics of Occupations ("SCO"), the companion publication to the DOT. Because the DOT and SCO are identical in the relevant provisions, the Court refers to only the DOT in its analysis.

other work and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). In some cases, courts require that the Commissioner obtain expert vocational testimony or other similar evidence. *See Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985). The Regulations clearly permit ALJs to rely on either the DOT or VE testimony when making the Step 5 determination. *See* 20 C.F.R. § 404.1566(d)-(e). Therefore, in some cases, a VE's opinion may conflict with the DOT's explication of the requirements for particular jobs.

Under the Social Security Rulings, occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT. SSR 00-4p, 2000 SSR LEXIS 8, at *4 (December 4, 2000). As part of the ALJ's duty to fully develop the record of a hearing, the ALJ "will inquire, on the record, as to whether or not there is such consistency." *Id*. at *5. When there is an apparent unresolved conflict between VE evidence and the DOT, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a determination of disability. *Id*. Neither the DOT nor the VE evidence automatically "trumps" the other when there is a conflict. *Id*. A conflict must be resolved by determining whether the explanation given by the VE is reasonable and provides a basis for relying on the VE testimony rather than on the DOT information. *Id*. The ALJ must explain in the determination or decision how any conflict that has been identified was resolved. *Id*. at *1.

Under governing circuit law, an administrative law judge may in appropriate cases give greater weight to expert vocational testimony than to findings in the DOT. *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir.2000). When a "direct and obvious conflict" exists between the VE's testimony and the DOT and the ALJ fails to explain or resolve the conflict, the testimony is "so lessened that reversal and remand for lack of substantial evidence usually follows." *Carey*, 230

F.3d at 146; *see also Gaspard v. Soc. Sec. Admin., Comm'r*, 609 F. Supp. 2d 607, 613 (E.D. Tex. 2009). However, when the conflict is tangential, implied or indirect, and it did not undergo adversarial development at the administrative hearing, the VE's testimony may be accepted and relied upon by the ALJ without resolving the later-proffered conflict provided the record reflects an adequate basis for doing so. *Gaspard*, 609 F. Supp.2d at 613 (citing *Carey*, 230 F.3d at 146).

A direct conflict may arise when the VE's testimony regarding the exertional or skill level of a particular job is facially different than that indicated in the DOT, or when the VE's testimony creates a conflict between the ALJ's RFC determination and the description of the jobs in the DOT. *Carey*, 230 F.3d at 145. Conversely, all kinds of implied conflicts and exceptions occur under a host of unique circumstances when VEs are called on to testify in regard to individual claimants' capabilities. *Id.* at 146-47. Since the DOT cannot satisfactorily address every such situation, claimants are not permitted to scan the record for implied or unexplained conflicts and then present the conflict as reversible error. *Id.*

Having set forth these general principles, the Court turns to consideration of the conflicts alleged here. First, Plaintiff contends that the VE's testimony in regard to Plaintiff's ability to perform work as a conveyor tender is at odds with the DOT. (Pl. Br. 6.) The DOT provides that the job of conveyor tender requires, among other things, frequent reaching and handling, occasional fingering, and occasional climbing. DOT § 921.685-026. The Plaintiff contends that the ALJ erred by failing to inquire how the loss of use of a non-dominant extremity would impact an individual's ability to reach, handle, finger, or climb in order to resolve the alleged conflict.

The DOT's description of a conveyor tender's responsibilities contains no requirement of *bilateral* arm capability. Therefore, any conflict is at most an implied conflict. *See Carey*, 230

F.3d at 145-46. Because Plaintiff failed to raise the conflict at the administrative hearing, she cannot now raise the issue as reversible error. *See id.* at 146-47. The ALJ was permitted to rely on the VE's testimony so long as the record reflects an adequate basis for doing so. *Id.*

Second, Plaintiff notes that though the VE testified in regard to Plaintiff's ability to perform work as a sorter or small-item inspector, the DOT does not include any specific listings designated simply as "sorter" or "small-item inspector." (Pl. Br. 4.) Plaintiff argues that this lack of specificity rendered the ALJ incapable of identifying and obtaining a reasonable explanation for any apparent conflicts between the VE's testimony and information in the DOT. (*Id.*) Plaintiff alleges that the ALJ's decision to accept and rely on the VE's testimony without further inquiry was critically prejudicial, meriting reversal. (Pl. Br. 3, 5.)

The DOT does contain a general sorter position and several inspector positions consistent with the positions described by the VE.. *See* DOT §§ 569.687-022, 369.687-022, 684.684-010. However, Plaintiff has cited no examples of an inspector or sorter job in her brief or at the administrative hearing that explicitly requires capabilities beyond the ALJ's RFC determination. Thus, the Court must evaluate the conflicts arising from the VE's use of generic terms as implied conflicts at best. *See Carey*, 230 F.3d at 146-47; *cf. Lopez v. Astrue*, No. 5:07-CV-169-BG, 2008 U.S. Dist. LEXIS 112994, at *13 (N.D. Tex. Mar. 27, 2008) (finding a conflict where the VE testified the claimant could perform work as a "machine tender" but the DOT classifies some machine tender jobs as medium-heavy work and some as light work). Because the Plaintiff failed to raise the issue during the administrative hearing, the Plaintiff cannot present any conflict as reversible error. *See Carey*, 230 F.3d at 146-47. The ALJ was permitted to rely on the VE's testimony so long as the record reflects an adequate basis for doing so. *Id.*

The Court finds that there is adequate support for the ALJ's decision to rely on the VE's testimony. First, the DOT is a general list of the maximum requirement of occupations. A VE, on the other hand, may be able to provide more specific information about the jobs as they are performed in specific settings. See SSR 00-4p, 2000 WL 1898704, at *3. Moreover, the Fifth Circuit stresses that "[t]he value of a vocational expert is that he [or she] is familiar with the specific requirement of a particular occupation, including working conditions and the attributes and skills need. *See Carey*, 230 F.3d at 145; *Fields v. Bowen*, 805 F.2d 1168, 1170-71 (5th Cir. 1986).

Finally, the issue here is similar to the one considered in *Carey*, i.e., whether the applicant could perform specified jobs with one arm and hand. In *Carey*, a plaintiff with only one functional arm was deemed capable of performing jobs which the DOT defined as requiring "manual dexterity" and "handling and fingering." *Carey*, 230 F.3d at 145. The Fifth Circuit noted that "[t]he conflict identified by Carey does not even become apparent until the further inference is made that the jobs require manual dexterity with, not one, but two hands. Moreover, that conflict is greatly mitigated by the [VE's] specific testimony that Carey could perform the identified jobs with only one arm and hand. Carey basically contends that the [VE's] testimony…should have been explored further, when Carey himself failed to do so in the administrative hearing." *Id*. at 146. The circumstances of the present case are substantially on point with those of *Carey*. Consequently, this Court follows the holding of that case. The VE's uncontroverted testimony was adequate to support the ALJ's determination that Plaintiff can perform the job of conveyor tender.

### D. Plaintiff's Ability to Communicate in English

"Communicate in English" means "the ability to speak, read, and understand English." *See* 20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5). "Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, [the ALJ considers] a person's ability to communicate in English when [the ALJ evaluates] what work, if any, he or she can do." *Id*. While Plaintiff argues that the record contains substantial evidence supporting her argument that she cannot communicate in English, the Court is limited in its analysis to whether substantial evidence exists that supports the ALJ's findings that Plaintiff can. *Greenspan*, 38 F.3d at 236.

The ALJ's findings are justified in the present case. The question of whether a claimant can communicate in English is consequential only as it relates to whether a claimant's imperfect English skills would preclude him or her from performing a job they could perform otherwise. *See* 20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5). While the transcript of Plaintiff's administrative hearing contains several examples of Plaintiff's imperfect English skills, the ALJ has a duty to evaluate Plaintiff's ability to communicate in English as it relates to her ability to function at a job. *Id*. Taken in this context, the examples of Plaintiff's imperfect spoken English, even compounded with her undisputed inability to read or write English, need not outweigh the fact that her testimony in English was otherwise meaningful. Substantial evidence supports the ALJ's decision that Plaintiff can adequately communicate in English.

### E. Fairness of Plaintiff's Hearing

To establish that a full and fair hearing was denied, a claimant must point to evidence that otherwise would have been offered and might have altered the ALJ's decision. *See Brock v.*

*Chater*, 84 F.3d 726, 728-29 (5th Cir. 1996); *see also Castillo v. Shalala*, No. 93-Civ.-7805, 1995 U.S. Dist. LEXIS 14834, at *7-*8 (S.D.N.Y. Oct. 10, 1995). In *Castillo*, the plaintiff alleged that his administrative hearing was adversely affected because he was not provided with an interpreter. *Id.* However, the plaintiff never stated that he *needed* an interpreter; only that he "would be more comfortable" having an interpreter. *Id*. The plaintiff's counsel was present and did not object. *Id*. On appeal, the plaintiff did not allege what specific parts of the hearing could have played out differently had an interpreter been provided. *Id*.

Plaintiff has likewise failed to show in any way that her testimony could have altered the ALJ's decision had she been provided with an interpreter. Further, Plaintiff's attorney did not object to the ALJ's denial of an interpreter, proceeding with the hearing in English. (Tr. 16.) Additionally, when Plaintiff previously requested a hearing before an ALJ, she indicated that an interpreter was unnecessary. (Tr. 63.) Because there has been no showing that a different result could have been rendered had an interpreter been provided, any error committed by the ALJ in his decision to proceed without one was harmless.

### III.  CONCLUSION

The Court does not reach Plaintiff's argument in regard to remand to a different ALJ. For the foregoing reasons, the final decision of the ALJ is **AFFIRMED**.

SO ORDERED, April 1, 2011.


PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE